IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CHARLES DANIEL LINDSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0526-CV-W-DW |
| | ) | |
| THE CITY OF ORRICK, MISSOURI, | ) | |
| and SHIRLEY TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

# ORDER

Charles Daniel Lindsey sues the City of Orrick and Mayor Shirley Taylor under 42 U.S.C. § 1983. Lindsey alleges that the City illegally terminated his employment as its public works director in retaliation for his constitutionally protected speech accusing Orrick's city council of violating open meetings laws. Now before the Court is the City's and Mayor Taylor's motion for summary judgment (Doc. 42). The Court denies the motion.

**I.     Summary Judgment Standard**

"Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005); Fed. R. Civ. P. 56(c). "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party." Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004). However, the non-moving party must present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in her favor. Rodgers, 417 F.3d at 850. The facts and inferences from those facts are viewed in the light most favorable to the nonmoving party. See Horn v. Univ. of Minn., 362

F.3d 1042, 1045 (8th Cir. 2004).

**II.    Summary of Ruling**

"To succeed on a First Amendment retaliation claim, a public employee plaintiff must show: (1) he engaged in protected speech, that is, speech on a matter of public concern; (2) his interest as a citizen in commenting on the issue outweighs the public employer's interest in promoting efficient public service; and (3) his speech was a motivating factor in the action taken against him."  Bailey v. Dept. of Elementary and Secondary Educ., 451 F.3d 514, 518 n.2 (8th Cir. 2006).

The First Amendment issues in this case require the Court to draw legal conclusions, informed, as needed, by the jury's findings on underlying facts.  See Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000) ("Any underlying factual disputes, however, are properly submitted to the jury through special interrogatories or special verdict forms.").  As discussed below, the Court concludes that Lindsey alleges he engaged in protected speech.  And—on the facts as the Court must take them—his interest in speaking outweighs the City's interest in promoting efficient public service by firing him.  Further, Lindsey's constitutional right to speak is clearly established such that Mayor Taylor is not entitled to qualified immunity.

The other arguments raised in the motion for summary judgment do not require lengthy discussion.  The record clearly raises a jury question as to whether Lindsey's asserted speech was a motivating factor in the decision to terminate his employment.  And there are disputed issues of material fact as to whether Mayor Taylor was a decision maker who might be held liable in this suit.

**III. Factual Background**

The City employed Lindsey as its public works director from October 2001 to April 2005. His duties included, for example, maintaining Orrick's city parks, water systems, and sewers. While Lindsey worked for the City, and owned land there, he never lived in Orrick, and never voted in a city election. Mayor Shirley Taylor was Lindsey's supervisor. In addition to the Mayor, the City was governed by a city council comprised of three elected members. Lindsey's job required him to attend city council meetings to report on public works.

In the Winter of 2002-2003, the City sent Lindsey to a training session, where he attended a seminar on Missouri's open meetings law. After the seminar, Lindsey believed that the City was violating the sunshine law by improperly entering non-public executive sessions. According to the council meeting minutes, Lindsey raised the issue at four different public meetings. On February 6, 2003,

> Dan reported to the council that he recently received training on the Sunshine Law. This training indicated sseveral areas where the city could improve it's compliance including a written policy that would be made available to the public. Dan requested that the council make a motion to have a committee of the city clerk, public works director, one council member, mayor and mayor pro-tem develop policy recommendation to the City council by March.
>
> The attorney said that he believes the ordinance we have is sufficient. He says the closed meetings he has attended have not violated the law.
>
> Kim Kolosick said that he remembered one meeting where one council member said they needed to go into executive session to discuss a contract.
>
> Mayor Jeff John said that is why we have an attorney present at meetings.
>
> Dan told the council that he felt the ordinance in which the pension was set up was wrong and the council did not correct it. The council had voted 12% after 15 years. The Ordinance read 15%. The clerk said that she corrected the ordinance to 12% as voted and has been paying the 12%.

3

Dan said that when he had asked the council to grandfather Kay Vaughn's pension, he was told this was a closed session matter. He was told that she has been part time until last year and had the opportunity to go full time but did not want to. Dan was told that if Kay has a problem with this, she needs to talk to them instead of him.

Then, on April 22, 2004,

Zoe Davis made the motion to enter into executive session for personnel reasons. She said to discuss Dan, Kay and Billy Joe. Dan requested that he be present when they discussed him. This request was denied. He was told they would talk to him later.

Christi McGlolthlin seconded this motion. Zoe, Christi, Robin and Jason voted yes. Motion passed.

After the council re-entered public session,

Dan spoke to the council and said he believed their were some irregularities in following some ordinances and would like to review the compliance of Kay Vaughn's vacation.

In reviewing the pension ordinance, he noticed that on February 7, 2001 this was a closed meeting. He said it should not have been and requested it be opened.

Dan also told the council that the clerk had been keeping notes on him. He questioned her about this. She told him she did document some things. He requested that when he is being discussed in executive session, Jeanette, the clerk, not be present.

The clerk then asked him about his compliance with the zoning ordinances. He then said he resigned from the zoning position.

Later, at the October 20, 2004 council meeting,

Zoe stated she wanted to go into executive session per RSMo 610.010-610.030 and City Ordinance 24.630. Dan read the State Statute to the council about going into executive session. Dan asked them not to do an illegal meeting. He told the council that they would need to vote no in order to not be a part of illegal meeting.

Shirley stated that she wanted to go into closed session to bring the council up to date on the issue brought before them last month.

4

> Christi made the motion to enter into executive session to have the mayor bring them up to date on a personnel issue from last month's meeting. Robin Nichols seconded this motion. Christi, Robin and Zoe voted yes. Motion passed.
>
> Robin Nichols made the motion to go into open session. Christi McGlothlin seconded this motion. Robin, Christi and Zoe Dave voted yes. Motion passed.
>
> A short discussion was held on the Sunshine Law.

Finally, on January 6, 2005,

> Dan Lindsey told the council that in regard to the Sunshine Law, February 6, 2003, he requested they look at what they were doing and he had no response. In April, 2004, he said he asked again. Since April he says there have been fifteen violations of the Sunshine Law. He says Ordinance 2129, 2130 and 2131 were written and formulated outside an open meeting and presented for passage without having a discussion in an open meeting. He says the one ordinance increased the vacation leave for part-time employees. He asked if they were aware of this. He would like the council to go back and have them read our procedure of resolutions and ordinances that says the alderman sponsoring the ordinance presents it to the council for discussion. Copies shall be made Available to the public for inspection prior to the time the bill is under consideration. He says our ordinance says after the first reading, it is open for debate. He says we never debate it. He says it cannot be passed unless the public has time to review it. Dan says we bypass any open discussion.
>
> Mayor Taylor says we do discuss the ordinance and the council then votes. Shirley said she is not saying they do not make mistakes. They can be corrected.
>
> Dan wants the council to review their repealed ordinance. Dan says they repealed an ordinance that part-time employees got pro-rated benefits and changed it to where they get the same as full time employees. The clerk said this was not correct. She said they repealed the pro-rated benefits and not part-time employees get not benefits.
>
> Christi McGlothlin asked if anyone had a copy of this ordinance. Dan said he could go to the city hall and get one. Christi requested that this matter be tabled until the next meeting. Dan told Christi to not doubt his work. She said she was not but wanted to see the ordinance.
>
> Dan then requested that the clerk put in the minutes that he is requesting that they do not formulate policy outside a public meeting to discuss formulating policy.

5

> He says Ordinance 2129, 2130 and 2131 never had an open discussion.
>
> Mayor Taylor said she would like to make a statement also that if something is not on the agenda, it will not be discussed.
>
> Dan asked Shirley if she would do that with all Zoe's closed session meetings?
>
> Shirley asked the discussion to come to an end because it was not on the agenda. Dan asked if that could be put on the next agenda. Shirley told him to put it in writing and give to the clerk.
>
> Dan requested that the council review the procedures on passing ordinances.
>
> Shirley told the council that she would like a motion to enter into closed session to discuss personnel according to RSMo 610.021-610-030 and City Ordinance 24.630.
>
> Christi McGlothlin made the motion to enter into closed session per RSMo 610.021-610-030 and City Ordinance 24.630. Robin Nichols seconded this motion. Christi, Robin and Zoe voted yes. Motion passed.

Later in that meeting, in open session, the "Council read the ordinance in question by Dan Lindsey. They will discuss it at the next meeting."

During the third week of March 2005, Lindsey met with Taylor at her house. He told the Mayor that he was going to schedule a meeting in Jefferson City with an assistant attorney general to address the City's failure to comply with the law. He said that he already had several telephone calls with the state's lawyer. Less than a month later, on April 12, the City fired Lindsey. Now that he is not employed in Orrick, he is less concerned with the open meetings issue. As he testified, "Well, if I was working there, I would want them to be following the rules and following the law. Since I don't work there, I don't have as much interest."

6

### IV. Discussion

#### A. <u>Garcetti</u>

The Supreme Court recently held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 1960 (2006). Under <u>Garcetti</u>, a deputy district attorney who is required to prepare a memo may be terminated based on the content of the writing, even if it touches on an issue of public concern. <u>Id.</u> at 1955-62. Or assume a city engineer/director of public works is assigned to provide the board of alderman with advice as to whether a dam is structurally capable of supporting a roadway. He might be legally fired for advising that inadequacies of the dam create potential for dangerous flooding of homes. <u>See</u> <u>Kincade v. City of Blue Springs</u>, 64 F.3d 389 (8th Cir. 1995) (finding First Amendment protection on similar facts), <u>cert. denied</u>, 517 U.S. 1166 (1996). On the other hand, "a schoolteacher speaking out on behalf of himself and others at a public school board meeting could not be penalized for criticizing pending collective-bargaining negotiations affecting professional employment." <u>Id.</u> at 1964 (Souter, J., dissenting) (citing <u>Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n</u>, 429 U.S. 167 (1976)).

Under this Court's reading, the rule of <u>Garcetti</u> would operate if Lindsey were the City's regulatory compliance officer. <u>See</u> <u>Garcetti</u>, 126 S. Ct. at 1265 (Souter, J., dissenting). This case is more like <u>Madison</u>, where the employee wears "a citizen's hat." <u>See id.</u> at 1964 (Souter, J., dissenting). True, Lindsey attended council meetings as an employee. On this record, his official duties were a cause-in-fact of his in-meeting speech: he would not have attended if he were not

7

public works director. But unlike in Garcetti, the speech itself was not part of the job. Lindsey acted officiously, speaking out of turn on a subject matter clearly outside of his job description. See Spiegla v. Hull, 371 F.3d 928, 939 (7th Cir. 2004) (whistle-blowing corrections officer "acted beyond her employment capacity"); Cf. Sheppard v. Beerman, 317 F.3d 351, 352 (2d Cir. 2003) ("[T]he First Amendment protects the eloquent and the insolent alike."). Thus, the Court concludes that Lindsey did not utter his in-meeting speech pursuant to his official duties. Importantly, even if Garcetti could be read to reach Lindsey's speech in public meetings, his private conversation with Mayor Taylor in March 2005 would still be protected.

### B. Connick

Under the Connick prong of analysis, the Court must decide whether Lindsey spoke on a matter of public concern by considering the "content, form, and context of a given statement, as revealed by the whole record." Connick v. Meyers, 461 U.S. 138, 147-48 (1983); see also Fales v. Garst, 235 F.3d 1122, 1123 (8th Cir. 2001); Belk, 228 F.3d at 878-80. "An employee's speech touches upon a matter of public concern when it is a 'matter of political, social, or other concern to the community' at large." Kincade, 64 F.3d at 396 (quoting Connick, 461 U.S. at 146). "Connick emphasized that speech does not touch upon a matter of public concern when the employee speaks 'upon matters only of personal interest.'" Id. (quoting Connick, 461 U.S. at 147). "Statements that deal with personnel matters are not generally protected by the First Amendment, and statements of 'purely academic interest' to the speaker will be given broader protection than those in which she has a personal interest." Belk, 228 F.3d at 879 (citing Shands v. City of Kennett, 993 F.2d 1337, 1343 (8th Cir. 1993). See also Buazard v. Meredith, 172 F.3d 546, 548 (8th Cir. 1999) ("When a public employee's speech is purely job-related, that speech

8

will not be deemed a matter of public concern.").

As to content, the City misses the point when it stresses that Lindsey's speech concerned "the employment issue of 'retirement and other benefits for municipal employees' and not an issue of public concern." The record as a whole does reveal that the speech—at least in part—related to those personnel issues. But Lindsey's complaint was, at its base, about compliance with state law.[1] See Belk, 228 F.3d at 879. Instead of speaking on matters of purely personal interest, his speech was *explicit criticism of the city council's conduct of public meetings, including a threat of complaining to state law enforcement authorities*. And "criticisms, no matter how obnoxious or offensive, of government officials and their policies clearly address matters of public concern." Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993) (plaintiff, a police and fire dispatcher, spoke on a matter of public concern when he complained about fire department policies, and suggested that the state auditor might be contacted, and that such scrutiny might mean trouble for the city clerk and the mayor). See also Pickering v. Bd. of Educ., 391 U.S. 563, 571-72 (1968) (["F]ree and open debate is vital to informed decision-making by the electorate."); Belk, 228 F.3d at 878 ("Speech that criticizes a public employer in his capacity as a public official also addresses matters of public concern."); Campbell v. Ark. Dept. of Corr., 155 F.3d 950, 960 (8th Cir. 1998); Kincade, 64 F.3d at 396-99; Eberhardt v. O'Malley, 17 F.3d 1023, 1026 (7th Cir. 1994) ("whistle-blowing or otherwise

---

[1] The City argues that because Lindsey was a non-resident employee, whose interest in the City's compliance stemmed only from his employment, he did not speak "as a citizen." It is true that he is not a politically active Orrick resident who votes in local elections, runs for public office, writes letters to the local newspaper, and erects signs on his lawn. These facts are relevant to defining Lindsey's role in speaking, but they are marginal to the core of material facts in this case.

9

'going public' with matters in which the public might be expected to take an interest").

Further—more specifically—Courts have held that compliance with open meetings law is a matter of public concern. See Dishnow v. Sch. Dist. of Rib Lake, 77 F.3d 194, 197, 198 (7th Cir. 1996) (Posner, C.J.) (holding that several instances of speech—among them tipping off the media to a violation by school board of state open-meetings law—were matters of public concern, and it was "frivolous" to argue otherwise); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987) (complaint that closed meeting of fire board violated state freedom of information law is matter of public concern). Cf. Barker v. City of Del City, 215 F.3d 1134, 1139 (10th Cir. 2000) (city conceded that city manager's speech about claimed violations of open meetings law is matter of public concern).

As to the context of the speech, the City suggests that Lindsey's private meeting with Taylor "is of no legal significance whatsoever" because his speech was not broadcast to the public. The Court sees no precedent for that proposition, and Eighth Circuit law is to the contrary: "Although the context of the speech must be considered, the fact that a plaintiff made statements in a private conversation about a public official toward whom she may have harbored personal animosity does not vitiate the status of statement as addressing a matter of public concern." Belk, 228 F.3d at 879. "Private statements are particularly amendable to First Amendment protection when they are made to a public official in his official capacity." Id. at 879-80.

**C.     Pickering**

The "government must be able to give a good reason . . . for wanting to deter protected speech by attaching a sanction to it." Eberhardt, 17 F.3d at 1027. The Court judges the

10

government's asserted reason with the Pickering balancing test. Pickering, 391 U.S. at 568-73. That test requires a balancing of Lindsey's interests, as a citizen, in making the statements against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568. The Court takes into account a number of interrelated factors, including "(1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties." Belk, 228 F.3d at 880-81. The City bears the burden of establishing permissible grounds for Lindsey's discharge. See Kincade, 64 F.3d at 397.

Mere allegations of disruption are insufficient to put Pickering balancing at issue. See Sexton v. Martin, 210 F.3d 905, 912-13 (8th Cir. 2000) (affirming refusal to apply Pickering balancing); Belk, 228 F.3d 881-82 (same); Kincade, 64 F.3d at 398 (same). Lindsey argues that the City has made no threshold showing of disruption, and thus the Court need not balance the interests. He has a strong argument. But with respect to Lindsey's speech in public meetings, the City does point to some evidence of disturbance. First, Lindsey openly tape recorded a meeting and videotaped another. That may have been "odd," but it was not particularly disruptive. Second, the City's main point is that Lindsey was "confrontational" when delivering his speech. The Court accepts that the friction—maybe even enmity—between Lindsey and city leaders detracted from the spirit of teamwork and cooperation at city hall. It is no surprise that a

11

mayor and city council members are annoyed when an employee threatens to report their alleged illegal meetings to state authorities. Officials accused of wrongdoing necessarily feel a lack of "cooperation" from the whistleblower. Beyond the strained relationship between Lindsey and his superiors, however, there is no evidence that Lindsey's speech adversely affected the city government. Assuming that the City makes a threshold showing of disruption, the Court concludes based on the totality of evidence that the interests balance heavily in Lindsey's favor. See Pickering, 391 U.S. at 568-73.[2]

Evaluating the in-meeting speech under Pickering may unnecessarily complicate this case. If one ignores the council meetings, and focuses on the private complaints to Mayor Taylor, there is no Pickering issue. Taking the facts in Lindsey's favor, a reasonable jury could find that the City terminated his employment because he told the Mayor he would make an open-meetings complaint to the attorney general.

### D. Qualified immunity

Under the doctrine of qualified immunity, state actors are protected from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Court has ascertained that Lindsey asserts a violation of a constitutional and statutory right. The evidence could prove that violation. The next step in the qualified immunity inquiry is determining whether the constitutional right was clearly established at the time of his discharge. See Sexton, 210 F.3d at 909. "For a right to be deemed clearly established, the contours of the

---

[2]The City emphasizes that its counsel advised that it complied with open meetings law. However, it simply does not matter if Lindsey was wrong on the law. The court in Kincade, 64 F.3d at 399, considered legal advice as to firing—not as to the validity of the uttered complaint.

12

right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (internal quotations omitted). The unlawfulness of the official act need only be "apparent in view of pre-existing law." Id. "Therefore, if the law claimed to have been violated was clearly established, the qualified immunity defense ordinarily fails, since a reasonably competent public official should know the law governing his conduct." Id. at 910 (quoting Harlow, 457 U.S. at 818-19).

First, the Court looks to whether it was clearly established that Lindsey spoke on a matter of public concern. See id. at 910-11. Considering the cases cited in this Order, particularly in Part IV.B, the Court concludes that, in 2005, it was clearly established that: (1) speech alleging misconduct by public officials was a matter of public concern; and (2) speech touching on public officials' potential violation of open meetings laws was a matter of public concern.

Next, the Court considers whether the outcome of Pickering balancing was clearly established. The Court of Appeals for the Eighth Circuit has held that when the Pickering test is at issue, the asserted First Amendment right will rarely be considered clearly established. Hall v. Mo. Hwy. & Transp. Comm'n, 235 F.3d 1065, 1068 (8th Cir. 2000). "[I]n deciding whether the free speech right is clearly established, it is critical to determine whether the defendants have put the Pickering balancing test at issue by producing evidence that the speech activity had an adverse effect on the efficiency of the public employer's operations." Kincade, 64 F.3d at 398 (quoting Grantham v. Trickey, 21 F.3d 289, 294 (8th Cir. 1994)). "[A] simple assertion by the employer that the speech activity affected morale" is not enough to support a grant of qualified immunity. Id. Officials must present "specific and unrefuted evidence" that the plaintiff's speech "substantially disrupted the work environment." Id.

13

In <u>Hall</u>, where the defendant successfully raised the issue of <u>Pickering</u> balancing, the Eighth Circuit affirmed the denial of qualified immunity, stating: "We have also held, however, that no right is more clearly established than freedom of speech, and that a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. We have also determined that speech alleging illegal misconduct by public officials occupies the highest rung of First Amendment hierarchy." <u>Hall</u>, 235 F.3d at 1068 (internal citations and quotations omitted).

Applying the law on this issue to the discussion in Part IV.C of this Order, the Court concludes that Taylor is not entitled to qualified immunity. Given the facts as the Court must take them, under the circumstances here, no reasonable official could have thought firing Lindsey because of his speech was lawful.

## V.     Conclusion

After carefully considering the record and the applicable law, the Court hereby

DENIES the motion for summary judgment (Doc. 42); and

DENIES Lindsey's motion to strike portions of the City's reply brief (Doc. 53).

SO ORDERED.

    /s/ DEAN WHIPPLE
Dean Whipple
United States District Judge

Date:   August 29, 2006

14